NO. 07-02-0515-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

APRIL 15, 2004

_____

TERRY ANTHONY WILSON,

Appellant

v.

THE STATE OF TEXAS,

Appellee

_____

FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;

NO. 45,476-B; HON. JOHN B. BOARD, PRESIDING

_____

***Opinion***

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

Terry Anthony Wilson (appellant) appeals his conviction for possession of a controlled substance. Through two issues, he contends 1) that his original appellate counsel was ineffective because he filed a defective notice of appeal and 2) the trial court erred by failing to grant his motion to suppress evidence. We affirm the judgment.

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2004).

*Issue One – Ineffective Assistance of Appellate Counsel*

Appellant initially argues that his first counsel was ineffective because he failed to properly perfect the appeal. Furthermore, the default was exemplified by counsel's filing of a general notice of appeal though his conviction resulted from a plea bargain. To the extent that the circumstances required appellant to perfect his appeal by filing a notice that comported with Texas Rule of Appellate Procedure 25.2(b)(3), that was and has been done. An amended notice comporting with that rule was delivered to this court before appellant submitted his brief. TEX. R. APP. P. 25.2(d) (stating that an amended notice of appeal correcting a defect or omission in an earlier filed notice may be filed in the appellate court at any time before the appellant's brief is filed). Thus, the default alluded to by appellant has been corrected, and his first issue is moot.

*Issue Two – Motion to Suppress*

Next, appellant posits that the trial court erred in denying his motion to suppress. This is purportedly so because the officer arresting him lacked reasonable suspicion to stop and subsequently frisk him. It was during the frisk that the officer discovered a plastic baggie containing rocks of crack cocaine in the pocket of appellant's windbreaker. We overrule the issue.

The stop occurred after three police officers, *i.e.* Rolan, Martinez and Vanover, conducted surveillance of a local bar. The group of officers conducted their surveillance from the back yard of an empty house across from the bar. Indeed, according to the testimony, it appeared as though the area was rife with empty or abandoned buildings. And, what caused the officer to take surveillance were several indicia. One involved Martinez having driven by the establishment around 11:30 p.m. and seeing an individual

2

in a yellow jacket standing in front of the bar during each pass. Another involved the "no loitering" signs posted on the walls of the bar. Over the course of six years, the owner of the establishment had personally asked Rolan to enforce the signs approximately 25 times, so Rolan testified.

Next, one or more of the officers knew that the bar was located in an area noted for its large quantum of drug trafficking. So too did they know that drugs actually had been sold from and drug-related arrests were previously made at the site being watched. Furthermore, the modus operandi utilized by the traffickers, according to Rolan, consisted of their waiting in front of the bar. Potential buyers would approach the bar environs and "make contact with" the seller. Or, the seller would walk to and make contact with individuals arriving at the site. And, irrespective of how it occurred, the encounters generally were fleeting.

Rolan further testified that police had appeared at the bar in response to disturbance calls. Some of those calls involved individuals discharging firearms in the street. Others encompassed large fights. As summarized by Rolan: "just an array of disorderly type calls."

On the night in question, and after Martinez had watched the man in the yellow jacket for approximately one-half hour, the officers noticed appellant appear at the front of the bar. He wore a dark colored light-weight windbreaker and "loitered" outside the front of the bar for 20 to 25 minutes. That appellant and the other fellow simply "loitered" outside the front of the bar "surprised" Rolan because it was late January and cold that night. Indeed, he remarked about how it was "not common" for anybody to "just stand outside and freeze[]." Yet, in addition to loitering, appellant and the man in the yellow jacket stood next

3

to each other and appeared to converse, though the substance of any conversation could not be heard. Furthermore, the yellow-jacketed man would also approach and make brief contact with individuals who approached or left the bar.

Eventually another person joined the two individuals outside the bar. Thereafter, the officers decided to approach them. They did so from the side of the bar. When Rolan came into view, appellant "walked hastily off the sidewalk into the . . . north parking lot . . . ." He "wasn't going towards any type vehicle, because it was just a vacant spot that he started walking into, as if he were surprised by our presence." At that point, Rolan "detained" appellant, "brought him back up to the sidewalk to speak to him, and identify him." Then, "because of the past weapons calls here, for my own personal safety," the officer "decided to conduct a pat down." As he did so, he saw the end of a plastic baggie protruding from an open pocket in appellant's windbreaker. That crack cocaine was often packaged in such baggies was known to the officer. As he told the trial court, "[f]rom my six years of working down here . . . I made numerous arrests . . . [a] majority of all the arrests . . . I made involved crack cocaine being contained within the plastic baggies." Thus, seeing the baggie, Rolan pressed against the outside of the pocket and felt "hard small rock-like objects." Based upon "all [his] years of experience," he immediately recognized the items he felt to be "crack cocaine." The baggie was then "retrieved" and appellant arrested.

So too did the man in the yellow jacket attempt to leave when approached by Martinez. The latter, however, detained him and also discovered cocaine on his person after conducting a search.

4

As previously mentioned, appellant believes that Rolan had neither reasonable suspicion to stop or search him. Thus, the trial court erred in denying the motion to suppress, in his view.

The standard of review applicable is one of abused discretion, as described in *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997), *Benitez v. State,* 5 S.W.3d 915, 921 (Tex. App.–Amarillo 1999, pet. ref'd), and *LaSalle v. State,* 923 S.W.2d 819, 823 (Tex. App.–Amarillo 1996, pet. ref'd). Furthermore, when no findings of fact are executed, as here, we must view the evidence in a light favorable to the trial court's ruling. *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

Next, one may be temporarily detained when an officer has specific and articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably suspect the detainee has engaged or is (or soon will be) engaging in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). In other words, there must be some indication that an unordinary activity is or has occurred, that the suspect is linked to the unusual activity, and that the activity is related to crime. *Gurrola v. State*, 877 S.W.2d 300, 302 (Tex. Crim. App. 1994). Because this standard is an objective one, the officer's subjective intent is irrelevant. *Garcia v. State,* 43 S.W.3d at 530. And, when applying it, we must consider the totality of the circumstances. *Id.*

Finally, once a person is detained, an officer may frisk the detainee when he reasonably suspects he is dealing with an armed individual. *Davis v. State*, 61 S.W.3d 94, 97 (Tex. App.–Amarillo 2001, no pet); *Maldonado v. State,* 853 S.W.2d 746, 748 (Tex. App.–Houston [1st Dist.] 1993, no pet.) (citing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868,

5

1883, 20 L.Ed.2d 889 (1968)). This does not mean that the officer must be absolutely certain that the individual is armed; nor does the officer have to have probable cause to arrest. *Davis v. State*, 61 S.W.3d at 97. Rather, the issue is whether a reasonably prudent officer in the same circumstances would be warranted in believing that his safety or that of others is in danger. *Id.; Carmouche v. State*, 10 S.W.3d 323, 329 (Tex. Crim. App. 2000) (stating that the officer must have before him specific and articulable facts reasonably leading him to conclude that the suspect might possess a weapon). Moreover, that weapons and violence are associated with the drug trade is rather settled. *Carmouche v. State*, 10 S.W.3d at 330. Thus, encountering one who is reasonably suspected of engaging in drug activity can justify a brief and minimally intrusive frisk of his person. *Id.* And, so long as the officer had legitimate basis to frisk for weapons it matters not that the officer also may have thought to search for narcotics. Again, the subjective intent of the officer is irrelevant. *Garcia v. State*, 43 S.W.3d at 530.

In viewing the evidence and inferences therefrom in a light most favorable to the trial court's decision, we conclude that the trial court reasonably could have inferred that the officers were doing more than simply attempting to enforce the bar owner's admonition against loitering.[2] Instead, it could deduce that the officers were looking for and thought they spied potential drug traffickers in appellant and the man in the yellow jacket. Indeed, the very factors rendering suspect the proposition that the police were simply watching for loiterers are some of the very factors permitting one to infer that those lingering in front of

_____

[2]Admittedly, two officers said that they approached appellant and the man in the yellow jacket to inform them about their loitering. Yet, it seems somewhat specious to suggest that three reasonable police officers would spend substantial periods of time hiding in a backyard of an abandoned house during a cold winter's night solely for the purpose of apprehending loiterers appearing in the middle of a drug zone.

6

the bar were dealing in drugs. For instance, the area was not only a known drug zone but it was known that drugs were actually sold from the environs of the bar itself. Furthermore, appellant and his companion were standing around outside the building much like the trafficker mentioned in Rolan's description to the trial court about how drugs were sold from the locale. So too did both converse with each other while the man in the yellow jacket approached those attempting to enter and exit the bar (also much like the trafficker in Rolan's description about how drugs were sold). More importantly, and as professed by Rolan, it was surprising to see people standing outside in the cold and wee hours of the night for an extended period simply to socialize. Given that at least one court has opined that loitering outside a known drug house "speaks for itself" and is indicative of "an intent to buy or sell drugs," *see Lucky v. State*, No. 05-02-0108-CR, 2003 Tex. App. LEXIS 11 (Tex. App.–Dallas January 6, 2003, no pet.) (not designated for publication), it seems appropriate to recognize that a reasonable officer could also view the activity of appellant and the man in the yellow jacket at the time and place as indicia of illegal conduct.

To this we add the evidence that as the three officers approached and were spied by appellant and his companion, both tried to leave. If presented at trial, evidence of an attempt to escape in the face of police presence can be interpreted by the factfinder as a consciousness of guilt. Thus, there is no reason to assign it less weight when offered during a pretrial hearing to determine whether an officer had legitimate basis to stop a suspect. We caution, however, that here we have more than just effort to depart. If this were not so and if the officers did not have before them other indicia leading them to reasonably suspect that crime was afoot as they approached their quarry, the latter's decision to leave would not be enough to create reasonable suspicion. *Gurrola v. State*,

7

877 S.W.2d 300, 303 (Tex. Crim. App. 1994); *Davis v. State*, 61 S.W.3d 94, 97 n.1 (Tex. App.–Amarillo 2001, no pet.). This is so because one retains the freedom to depart from a consensual encounter with the police. *Id.*

In short, and given the area's reputation, the reputation of the bar for being a place where drugs were sold, the time of day and year, the cold weather conditions, the length of time appellant and the man in the yellow jacket stood in front of the bar, and the similarity between their conduct and that of previous drug traffickers at the location, the trial court had sufficient basis to conclude that a prudent officer could reasonably suspect that appellant and the man in the yellow jacket were engaging in unusual activity related to criminal activity, *i.e.* drug trafficking. Furthermore, once the officers had basis to detain them, the latter's effort to leave further enhanced the articulable facts justifying detention.

Next, because the Texas Court of Criminal Appeals recognizes that weapons, violence and drugs go hand in hand, *see Carmouche v. State,* 10 S.W.3d at 330, a prudent officer could reasonably suspect that appellant, a suspected drug trafficker, could pose a physical danger. So, the trial court had basis upon which to approve of the pat-down for weapons of appellant's outer clothing. And, it was during the pat-down that Rolan spied the plastic baggie (reminiscent of those used by drug traffickers) protruding from the open pocket of the windbreaker. This caused him to continue the frisk of the outer portion of the pocket with his open hand, which act immediately verified his suspicion about the nature of the object within the pocket. And, having basis to reasonably conclude that the object was drugs, the officer was not obligated to ignore it. Again, the object of the pat-down is self-preservation or the protection of others. Yet, once basis exists that warrants a frisk for weapons, the officer is not required by law to close his eyes to other contraband that he

may immediately recognize during the minimally intrusive search. *Carmouche v. State*, 10 S.W.3d at 330.

Contrary to appellant's suggestion, this case is not controlled by our decision in *Davis v. State*, 61 S.W.3d 94 (Tex. App.–Amarillo 2001, no pet.). There, we remarked about the absence of evidence indicating that drug arrests had ever been made at the scene. Here, Rolan testified not only that drugs had previously been sold from the exact locale under surveillance but also that he personally had made numerous arrests there "primarily [for] narcotics." Nor did the record in *Davis* include testimony from an officer that it was unordinary for someone to be standing outside at that time of night and during the "dead of winter." Similarly lacking in *Davis* was evidence explaining the method by which drugs were previously sold from the locale and against which the officers and trial court could compare appellant's conduct and that of his compatriot on the street.

Also distinguishable from the case before us are two other opinions cited by appellant. We acknowledge that in *Gurrola v. State*, the Court of Criminal Appeals recognized that a person has a right to walk away from an officer if the latter has no legitimate basis to detain him. So too did it say that the detainee's presence in a high crime area was not enough to create reasonable suspicion justifying detention. Yet, the court was careful to note that it was not unordinary for several men to be conversing in a parking lot in the late afternoon. And, because it was not, the officer lacked basis upon which to make the stop. Here, we not only have a high crime area but prior drug activity at the very site of the stop. So too do we have testimony allowing the trial court to find comparable the conduct of the suspects (both appellant and the man in the yellow jacket) at bar with the modus operandi of prior drug dealers at the site. Nor can we forget Rolan's

testimony, the general tenor of which indicated that it was quite surprising to see those suspects loitering for an extended period of time outdoors at a place from which drugs were known to be sold late on a cold winter's night. These very circumstances also distinguish our situation from that before the court of appeals in *Gamble v. State*, 8 S.W.3d 452 (Tex. App.–Houston [1st Dist.] 1999, no pet.), the second case relied upon by appellant.

In sum, the trial court had before it sufficient evidence upon which to conclude that there existed reasonable suspicion to stop and frisk appellant. Because it did, its decision to overrule the motion to suppress did not evince an instance of abused discretion. Thus, we affirm the judgment of conviction.


Brian Quinn
Justice

Publish.