NO. 07-03-0400-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 19, 2004

_____

TOMMY TUCKER,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;

NO. 46,391-B; HON. JOHN B. BOARD, PRESIDING
_____

*Opinion*
_____

Before QUINN, REAVIS and CAMPBELL, JJ.

Tommy Lee Tucker (appellant) appeals his conviction for possession of a controlled substance. Via a single issue, appellant contends that the trial court erred by failing to grant his motion to suppress. Appellant contended below and here that the officer who stopped him for a traffic violation lacked justification to frisk the outside of a fanny pack he wore at the time. For the following reasons, we agree and reverse.

## Standard of Review

The standard of review applicable is one of abused discretion, as described in *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997), *Benitez v. State,* 5 S.W.3d 915, 921 (Tex. App.–Amarillo 1999, pet. ref'd), and *LaSalle v. State,* 923 S.W.2d 819, 823 (Tex. App.–Amarillo 1996, pet. ref'd). We refer the litigants to those cases in lieu of discussing them here. Furthermore, while the trial court executed findings of fact, we have a complete record of the suppression hearing before us. Thus, we have the authority to assess whether any evidence appeared of record to support the findings issued. *Garcia v. State,* 919 S.W.2d 370, 387 (Tex. Crim. App. 1994).

Next, it is beyond dispute that one may be temporarily detained when an officer has specific and articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably suspect the detainee has engaged or is (or soon will be) engaging in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001); *Wilson v. State*, 07-02-0515-CR, 2004 Tex. App. Lexis 3454 (Tex. App.–Amarillo April 15, 2004, no pet. h.). In other words, there must be some indication that an unordinary activity is or has occurred, that the suspect is linked to the activity, and that the activity relates to crime. *Gurrola v. State*, 877 S.W.2d 300, 302 (Tex. Crim. App. 1994). Because this standard is an objective one, the officer's subjective intent is irrelevant. *Garcia v. State,* 43 S.W.3d at 530. And, when applying the standard, we must consider the totality of the circumstances. *Id.*

Additionally, once a person is detained, an officer may frisk the detainee when he reasonably suspects he is dealing with an armed individual. *Wilson v. State*, 07-02-0515-CR, 2004 Tex. App. LEXIS 3454; *Davis v. State*, 61 S.W.3d 94, 97 (Tex. App.–Amarillo

2

2001, no pet.); *Maldonado v. State,* 853 S.W.2d 746, 748 (Tex. App.–Houston [1st Dist.] 1993, no pet.) (citing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). In other words, that an officer has basis to stop because he believes criminal activity is afoot does not *ipso facto* allow him to frisk the suspect for weapons. Quite the contrary, there must also be circumstances before him which indicate the presence of danger. This does not mean that the officer must be absolutely certain that the individual is armed. *Davis v. State,* 61 S.W.3d at 97. Rather, the issue is whether a reasonably prudent officer in the same circumstances would be warranted in believing that his safety or the safety of others is in danger. *Id.; Carmouche v. State,* 10 S.W.3d 323, 329 (Tex. Crim. App. 2000) (stating that the officer must have before him specific and articulable facts reasonably leading him to conclude that the suspect might possess a weapon). And, one must not forget that since the test is founded upon what the proverbial reasonable officer would have thought, the subjective beliefs of the actual officer performing the search are not determinative. *See O'Hara v. State,* 27 S.W.3d 548, 551 (Tex. Crim. App. 2000) (stating that whether a violation of the Fourth Amendment has occurred does not turn on the officer's actual state of mind at the time the challenged action was taken but rather on an objective assessment of the facts and circumstances confronting him). He may well have believed himself in danger, but if the surrounding circumstances will not justify a reasonably prudent officer to so conclude, then a frisk for weapons cannot be undertaken.

### *Application of Standard*

We initially make several observations which facilitate disposition of this appeal. First, the facts underlying the stop and search of appellant are undisputed. So, our job

3

simply consists of applying the law to those undisputed facts, and we do so *de novo*. *Guzman v. State*, *supra*.

Second, appellant does not contest the legitimacy of the stop at bar. Instead, he questions whether the officer had basis to frisk him for weapons.

Third, though routine traffic stops constitute seizures, *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001), they are comparable to temporary detentions, not arrests. *Id.*; *see Bachick v. State*, 30 S.W.3d 549, 551 (Tex. App.–Fort Worth 2000, pet. ref'd) (stating that a "routine traffic stop is a temporary investigative stop"). Thus, and contrary to the State's suggestion below, the mere fact that one is stopped for a traffic violation does not alone entitle the officer to search the detainee on the basis that the search was incident to a lawful arrest.

Fourth, the pivotal issue before us is whether the circumstances confronting officer Rolan justified a reasonably prudent officer to suspect that appellant was armed or carrying a weapon before the officer frisked the outside of the fanny pack. The latter act comprised the first search that occurred here, and if it was impermissible it matters not whether Rolan's subsequent removal of the item from appellant and manipulation of it quelled his subjective concerns regarding safety. *See O'Hara v. State*, 27 S.W.3d at 554 (stating that the removal of an obvious weapon from the suspect does not negate the need to frisk since other weapons could be in the suspect's possession and hidden from view).

With the foregoing said, we turn to the facts and circumstances confronting Rolan. They consisted of seeing appellant speed by on a motorcycle (thereby violating the speed

4

limit) at 3:40 a.m.[1]  Upon the officer giving chase and activating his emergency lights, appellant pulled over into the parking lot of a convenience store.  While appellant sat astride the vehicle wearing blue jeans, a black t-shirt with a Harley Davidson emblem on the back, and a leather fanny pack around his waist, the officer approached and asked for his driver's license.  Appellant complied.  Then, the officer queried appellant about his current address and the ownership of the motorcycle.  To the former, appellant provided the officer with an "alternate address, where he had also been staying."[2]  To the latter, appellant disclosed that the vehicle belonged to "Amerigo Rivera," a friend of his who had given him permission to use it.  At one point or another, appellant also disclosed that he had no insurance on the motorcycle.

Throughout the time Rolan and appellant interacted (and prior to the initial search), appellant was cooperative, according to the officer.  Moreover, when asked whether appellant appeared as if he was about to flee, or appeared to be resisting detention, or appeared to be committing any offense other than speeding, or appeared to be about to commit any offense, or appeared to be under the influence of any intoxicating substance,

---

[1]The State insinuates that appellant was someone attempting to flee from the officer immediately after the officer first clocked him.  This insinuation is based upon the testimony that appellant turned his head toward the officer's vehicle as he passed it and accelerated to 53 mph before the officer initiated his chase. Yet, what the State fails to mention is the officer's testimony that "[i]t was dark," that because it was dark he did not know if appellant made actual eye contact with him, that the officer caught up with appellant as appellant stopped for a red light, and that appellant pulled over once the officer activated his emergency lights. The officer also conceded that there was "no indication that [appellant] was fleeing from [him]" and that, in his view, appellant "was [not] supposed to stop before [the officer] turned on [his] lights."  So, given the totality of the circumstances perceived by Rolan at the time, the actual context of the evidence alluded to by the State, and the officer's own interpretation of what he perceived, the State's hypothesis about appellant trying to flee is questionable.

[2]In its findings of fact, the trial court stated that appellant "gave conflicting statements as to where he resided . . . ."  Yet, the "conflicting statements" were not mentioned.  Nor does the record disclose that conflicting statements were made.  When asked about his current address after providing the officer his license, appellant informed the officer of another address at which he was "also" staying.  Simply informing an officer of an address at which one is "also" staying does not exemplify conflicting statements.

5

the officer answered "no" to each. So too did the officer deny that appellant made any furtive gestures of any kind.[3] Yet, upon spying a "large bulge" which "noticeably protrud[ed]" from appellant's leather fanny pack, the officer not only directed him to interlace his fingers behind his head but also ran his "hand on the outside of the . . . pack to feel the bulge, and see actually . . . what kind of object might be in there."

Aside from categorizing it as large enough to be a weapon, the officer gave no description of the bulge.[4] Nor did he state that it resembled the outline of a firearm, knife or any other particular weapon. Eventually, he acknowledged to the trial court that he did not know what it was. Furthermore, when asked to identify the threat he perceived, the officer described it as "whatever he [appellant] may want to . . . can't read the man's mind. You never know what they're going to do." So too did he 1) state that "[i]f there wasn't a large bulge, I probably wouldn't have thought much about" the fanny pack and 2) concede that a fanny pack is "not necessarily a storage place for . . . a weapon" since "you can use it for whatever you want."[5]

---

[3]At oral argument, the State was asked about the record evincing furtive gestures by appellant. In response, it stated that as the officer approached, appellant interlaced his fingers behind his head. This purportedly suggested, to the State, that appellant had previously been involved with the criminal justice system. However, nothing presented during the hearing suggested that appellant had a criminal record, was believed to have had a criminal record, or had ever interacted with law enforcement personnel before this incident. More importantly, the record clearly reveals that appellant interlaced his fingers behind his head in response to the officer's directive to do so.

[4]He did testify that the bulge felt hard like a metal object. However, that observation was made after appellant conducted the initial frisk. And, unless the initial frisk was justified, observations or evidence obtained from the initial frisk cannot be used to legitimate it. *See Carver v. State*, 746 S.W.2d 869, 872 (Tex. App.–Houston 14th Dist. 1988, pet. ref'd) (stating that a search must be justified based on what is known to the officer at the inception of the search not by what is discovered as a result of the search). Similarly, that officer Rolan believed appellant tried to deceive him by identifying the object as a cell phone and that appellant denied Rolan the consent to search the pack (assuming of course the invocation of one's right to be free of unwarranted governmental intrusion can be considered against him) is irrelevant to our inquiry as well for they too came after Rolan had undertaken the initial frisk.

[5]The trial court did find that "Officer Rolan was aware that *person's* [sic], *including police officers*, frequently carry firearms and other weapons in 'fanny packs.'" (Emphasis added). Yet, a review of the officer's testimony actually discloses that Rolan said "a lot of police officers carry similar fanny packs for the

6

Unlike *Torres v. State*, 07-01-0401-CR, 2002 Tex. App. LEXIS 7491 (Tex. App.–Amarillo 2002, no pet.) (not designated for publication), a case on which the State relies, appellant was not acting nervously or making a gesture resulting in the inability of the officer to see the detainee's hands. Nor did the officer here say that he thought he saw the handle of a gun protruding from the detainee's coat pocket, unlike the situation in *Torres*.

Instead, the situation before us likens to that in *Keah v. State*, 508 S.W.2d 836 (Tex. Crim. App. 1974). There, the officers witnessed a car in which Keah rode commit a traffic violation. It was after midnight. Additionally, the vehicle stopped after the officers engaged the emergency lights of their patrol car. At that point, Keah lowered his shoulder "'as if to pick something up or stick something up under the seat.'" *Id.* at 837. Furthermore, appellant exited the car with his hand in his left pants pocket. "When appellant withdrew his hand, [an officer] saw a 'large bulge' in the pocket." *Id.* Appellant would not inform the officers what the bulge was, though they asked him three times to identify it. Thus, one of the policemen reached into the pocket and removed its content, which happened to be a plastic bottle and cellophane wrapper, each containing amphetamine pills. When asked, at a later hearing on Keah's motion to suppress, what he thought the bulge consisted of, the officer said, "'I did not know whether it would be a weapon or what it would be.'" *Id.* at 839. When asked if he had reason to believe appellant may have been dangerous, he

sole purpose of carrying handguns." Nowhere did he testify that anyone other than police officers did so. Nor can we say one can reasonably infer that lay people so carry weapons simply because police officers do. Police officers may well have reason to utilize fanny packs in that manner though lay people may not. Consequently, there is no evidence of record supporting the proposition that "persons" in general carry weapons in fanny packs. Indeed, there was not even one in the fanny pack of appellant.

7

replied, "'I did not know who he was.'" *Id.* These circumstances did not warrant the intrusion upon Keah's person, according to the Court of Criminal Appeals. *Id.* at 839-40.

Nor did seeing a bulge in his clothing justify the frisk of the appellant in *Davis v. State*, 576 S.W.2d 378 (Tex. Crim. App. 1978). This was true even though the officer "'didn't know if it was a weapon or what.'" *Id.* at 381.

Moreover, to the extent that the presence of a bulge was considered to be a factor justifying a frisk in other cases, articulable facts in addition to the mere presence of a bulge also appeared of record. For instance, in *Martinez v. State*, 500 S.W.2d 151 (Tex. Crim. App. 1973), the officer noticed a bulge in appellant's waist band and testified that it resembled a pistol. And, when asked if it was a gun, appellant said no, clamped his arm down on the item and turned away from the officer. In *Cox v. State*, 442 S.W.2d 696 (Tex. Crim. App. 1969), the officer was responding to a disturbance call at a local hospital and had been told that a man was carrying a gun. When the officer arrived at the scene, he saw someone fitting the description given him and noticed a bulge in the suspect's pocket. In *Garcia v. State*, 649 S.W.2d 697 (Tex. App.– San Antonio 1983, no pet.), the officer was told by four individuals at a dance that they saw someone with a gun. Furthermore, one of the four identified appellant as the person who had it. When the officer approached appellant, he saw a noticeable bulge in his boot. Here, we have none of those additional indicia. We have no furtive gestures on the part of appellant. Other than a traffic violation, we have no evidence of any crime, much less one involving violence, or the presence of

a high crime area.[6] We have no prior information from third parties about the presence of a gun. We have no one describing the bulge as something which appeared, at the time, to be a firearm or other weapon. We have no evidence of nervousness. We have no evidence about any prior acquaintance with or knowledge about appellant. We have no testimony from the officer that, based on his knowledge and experience, anyone other than police officers carried weapons or firearms in a fanny pack or that people committing traffic violations or riding motorcycles early in the morning are more likely to be dangerous or be carrying weapons. All we have is a large bulge appearing in a fanny pack being worn by someone stopped for speeding in the early morning hours and who was cooperating with the officer. When asked to explain the purported threat he perceived immediately before directing appellant to interlace his fingers behind his head, Rolan said that the threat was in whatever appellant might want to do since he could not read appellant's mind and you "never know what they're going to do."[7]

Rolan also conceded that he "probably wouldn't have thought much about" the fanny pack if it were not for the bulge. Yet, a bulge alone does not justify a frisk. *Keah v. State*, *supra*. And, this remains so even if the detainee rode a motorcycle at the time and had been stopped at night for speeding.

---

[6]As the State points out, the trial court made reference to the location of the stop as a factor in deciding to deny the motion. However, Rolan never testified about the area being one known for crime, violence, drug trafficking or the like. Therefore, no evidence supports the use of the location as indicia justifying the stop. On the other hand, evidence does appear illustrating that appellant stopped in a parking lot of a convenience store and that two other officers were at the site, apparently exiting from the store. Thus, Rolan was not alone in a secluded area at the time.

[7]So too did Rolan cite the purported deception of appellant as basis for feeling threatened. The deception to which he referred involved appellant's description of the bulge as his cell phone. Yet, that statement of appellant came after the initial search. Thus, it cannot serve as basis for supporting the initial search.

In sum, the articulable facts appearing of record do not support the conclusion that a reasonably prudent officer in the same situation as Rolan would have been warranted in believing that his safety or the safety of others was in danger. Thus, the trial court abused its discretion in denying the motion to suppress. Furthermore, the error resulted in the State tendering into evidence fruits of the illegal search, which matter constituted the basis of appellant's conviction. Consequently, we cannot but hold that the trial court's error was harmful under Texas Rule of Appellate Procedure 44.2(a).

Accordingly, the judgment is reversed and the cause remanded to the trial court for further proceedings.

Brian Quinn
Justice

Publish.