# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-18-00667-CR**
**NO. 03-18-00733-CR**

---

**John Anthony Davila, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF COMAL COUNTY**
**NOS. CR2016-123 & CR2016-471,**
**THE HONORABLE GARY L. STEEL, JUDGE PRESIDING**

---

## O P I N I O N

In cause number CR2016-123 (appeal number 03-18-00667-CR), appellant John Anthony Davila was charged with possession with intent to deliver a controlled substance, heroin, in an amount of four grams or more but less than 200 grams, and tampering with physical evidence. *See* Tex. Health & Safety Code §§ 481.102(2), .112(a), (d); Tex. Penal Code § 37.09(d)(1). In cause number CR2016-471 (appeal number 03-18-00733-CR), appellant was charged with possession with intent to deliver a controlled substance, methamphetamine, in an amount of four grams or more but less than 200 grams; possession with intent to deliver a controlled substance, heroin, in an amount of four grams or more but less than 200 grams; tampering with physical evidence; and unlawful possession of a firearm by a felon. *See* Tex. Health & Safety Code §§ 481.102(2), (6), .112(a), (d); Tex. Penal Code §§ 37.09(d)(1), 46.04(a). In an open plea to the trial court, appellant pled guilty to all six offenses. After a contested

punishment hearing, the trial court sentenced appellant to confinement in the Texas Department of Criminal Justice for fifty-five years for each offense pursuant to the habitual offender punishment provision of the Penal Code. *See* Tex. Penal Code § 12.42(d).

On appeal, appellant complains about the failure to comply with the timely trial provision of the Interstate Agreement on Detainers Act, asserts that the trial court lacked jurisdiction under the Act over the offenses charged in CR2016-741, and contends that the evidence was insufficient to support the trial court's deadly weapon findings as to the two drug-possession charges in CR2016-741. We affirm the trial court's judgments of conviction.

## BACKGROUND

On April 28, 2013, a patrol officer with the New Braunfels Police Department observed appellant commit several traffic violations. The officer attempted to initiate a traffic stop but lost sight of appellant and was unable to do so. A second officer, who was nearby, was called to assist in locating appellant and initiating the traffic stop. The second officer also saw appellant commit the traffic violations and observed appellant pull into a laundromat parking lot, drive through the parking lot, park in a stall of the car wash next door, get out of his car, and walk behind the building. By the time appellant had circled the building, the initial officer, who was familiar with appellant, had arrived at the scene. He spoke with appellant and received consent from appellant to search his car. During the search, on the driver's side floorboard under the seat, the officer found a Crown Royal bag that contained three baggies of a crystal white substance that appeared to be methamphetamine. While police were processing the scene, a civilian notified the officer that he had discovered a Taurus 9 mm semi-automatic handgun in the grass near the entrance of the laundromat next to the car wash. Appellant was arrested, and

2

officers discovered that he had $5,885 in cash in his wallet. Documents admitted into evidence in support of appellant's guilty pleas indicated that the substance found in the Crown Royal bag in appellant's car was 227.3 grams of methamphetamine.

A detective with the New Braunfels Police Department, who was assigned to the FBI gang task force, interviewed appellant following his arrest. Appellant admitted his involvement in illegal narcotics trafficking and said that, on the day of his arrest, he was transporting the narcotics to a stash house. Appellant informed the detective that, in his estimate, he had been distributing approximately one pound of methamphetamine per week for the last two months. Appellant also admitted that he had tossed the Taurus handgun out of his car when he pulled into the laundromat parking lot. He explained that he carried the weapon because of his affiliation with the Tango Blast Orejon street gang and his narcotics-distribution business.

After appellant bonded out for the April 28th offenses, the task-force detective learned that appellant had resumed his illegal narcotics trafficking.[1] Officers obtained an arrest warrant for unlawful possession of a firearm—stemming from the events at the laundromat on April 28th—and, on January 6, 2014, law enforcement began surveillance of the residence where appellant was believed to be staying.[2] After observing appellant arrive at the residence, quickly enter and exit while he left his car running, and then depart in his car, officers followed appellant and stopped him to arrest him on the outstanding warrant.

---

[1] Law enforcement had received information in a Crime Stopper tip about suspected drug-dealing activities at the residence where appellant was believed to be staying, including descriptions of appellant's involvement in the activities.

[2] Documentary exhibits admitted into evidence indicated that appellant's girlfriend lived at the residence, and appellant was staying with her.

After the stop was initiated, police instructed the occupants to get out of the car. Although appellant opened his driver's side door, he did not comply with the command to exit the car and instead made "furtive movements" toward the inside of the car.[3] The task-force detective then witnessed appellant throw an item out of the car before he got out. The thrown item was retrieved; it was a large amount of a black/brown colored tar-like substance, immediately identified by the detective as "black tar" heroin. During a search of appellant's car, officers found a loaded Smith & Wesson .357 handgun between the driver's seat and the center console wrapped in a white paper towel. Officers also discovered $3,484 in cash in appellant's wallet, a metal grinder, a clear baggy of marijuana, a clear baggy with five pills identified as Acetaminophen/Hydrocodone, a box containing multiple clear plastic bags, a burnt marijuana cigarette, and a clear baggy containing a white powdery substance. Appellant was arrested on the outstanding arrest warrant. Subsequent lab testing reflected that the substance that appellant threw from his car was 22.48 grams of heroin.

A detective with the Comal County Sheriff's Office obtained a search warrant for the residence where appellant had been staying. The search warrant was executed several hours later, and, during the search, officers discovered two clear plastic bags containing a crystal-like substance inside a larger plastic bag on top of a kitchen cabinet. Inside a chest of drawers in the master bedroom, officers found cash bundles totaling $2,020 inside of a folder along with appellant's mail. Two digital scales, which were described as being associated with "large[-] scale illegal drug dealing," were found in the bedroom, and another digital scale was discovered outside under the porch.

---

[3] The record reflects that the passenger in appellant's car immediately complied and exited the car.

4

The next day, detectives interviewed appellant at the Comal County Jail. Appellant claimed ownership of the narcotics in the bags found on top of the kitchen cabinet, which subsequent lab testing showed was 24.93 grams of methamphetamine.[4] Appellant agreed to work with law enforcement and verified information regarding his suppliers. At that time, he told the detectives that he purchased one-half pound of methamphetamine every week from his supplier for $7,000, paying his supplier $28,000 per month. He also admitted that the .357 handgun found in his car belonged to him and said that he had the firearm for approximately two years after he traded methamphetamine for it. Appellant subsequently bonded out of jail again.

On April 4, 2014, the New Braunfels police conducted another traffic stop of appellant. The patrol officer smelled marijuana coming from the car and, during a search of the car, discovered a metal grinder in the car. Aware of appellant's reputation for throwing narcotics or contraband from the car, officers searched along the area appellant had traveled prior to the stop. A white sock containing a clear plastic baggy of a brown, powder-like substance believed to be heroin was found in a driveway along the route that appellant had driven. After administering statutory and constitutional warnings, officers asked appellant about throwing any items from the car. Appellant was evasive in his answers, saying that it did not matter because he was going to jail anyways and that the officers knew what he had thrown so he did not have to say what it was. He then claimed that he merely threw a "joint" out of the window where the heroin had been found. On completing the inventory of appellant's car, officers found marijuana, two cell phones, and appellant's wallet containing $1,897 in cash. The patrol car

---

[4] Appellant told the detectives that his girlfriend was not involved in his illegal drug-dealing activities.

5

dash-cam recording of the traffic stop showed appellant throwing a white sock out of the open passenger-side window at the location where the sock containing the substance was recovered. Subsequent lab testing reflected that the substance was 15.46 grams of heroin.

On December 17, 2014, a federal grand jury indicted appellant for possession with intent to distribute a controlled substance (methamphetamine) and possession of a firearm in furtherance of a drug trafficking crime for offenses arising out of the events that occurred on April 28, 2013 (the laundromat/car wash incident). *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 924(c)(1)(A)(I). On November 13, 2015, after pleading guilty, appellant was convicted of both offenses in the United States District Court for the Western District of Texas and sentenced to time served on the drug-possession offense and to confinement for sixty months in the United States Bureau of Prisons for the firearm-possession offense.

On March 2, 2016, in cause number CR2016-123, a Comal County grand jury indicted appellant for possession with intent to deliver a controlled substance, heroin, in an amount of four grams or more but less than 200 grams, and tampering with physical evidence for offenses arising out of the events that occurred in connection with the traffic stop on April 4, 2014 (the sock-throwing incident). *See* Tex. Health & Safety Code §§ 481.102(2), .112(a), (d); Tex. Penal Code § 37.09(d)(1). The indictment contained four enhancement paragraphs alleging prior felony convictions—a conviction for possession of a controlled substance in an amount of one gram or more but less than four grams that occurred after two convictions for robbery and a conviction for burglary of a building—which subjected appellant to an enhanced punishment range as a habitual offender. *See* Tex. Penal Code § 12.42(d).

On July 6, 2016, in cause number CR2016-471, a Comal County grand jury indicted appellant for possession with intent to deliver a controlled substance, methamphetamine,

6

in an amount of four grams or more but less than 200 grams; possession with intent to deliver a controlled substance, heroin, in an amount of four grams or more but less than 200 grams; tampering with physical evidence; and unlawful possession of a firearm by a felon for offenses arising out of the events that occurred on January 6, 2014. *See* Tex. Health & Safety Code §§ 481.102(2), (6), .112(a), (d); Tex. Penal Code §§ 37.09(d)(1), 46.04(a). The drug-possession counts contained an allegation that a deadly weapon was used or exhibited during the commission of the offenses. The indictment also contained the same four enhancement paragraphs as the indictment in CR2016-123, alleging the same prior felony convictions, again subjecting appellant to an enhanced punishment range as a habitual offender. *See* Tex. Penal Code § 12.42(d).

On July 23, 2018, pursuant to a plea agreement, appellant entered an open plea of guilty to both offenses in cause number CR2016-123 and all four offenses in cause number CR2016-471, pled true to all of the enhancement paragraphs in both indictments, and waived the right to appeal issues related to guilt-innocence in both cases. As part of the plea agreement, the State consented to appellant's waiver of jury trial and agreed that whatever sentences the trial court imposed would run concurrently. The open plea called upon the trial court to decide the deadly weapon allegation relating to the drug-possession offenses in cause number CR2016-471. In support of the guilty pleas, the State offered multiple exhibits—which included offense reports, lab reports, and photographs—that were admitted in both cases without objection. The trial court ordered a presentence investigation, and the cases were reset, by agreement, for a contested punishment hearing.

The trial court reconvened for the punishment hearing on September 10, 2018. The court found appellant guilty of all of the charged offenses and found the allegations in the

7

enhancement paragraphs to be true. After both sides presented evidence, the trial court made affirmative deadly weapon findings as to the drug-possession offenses in cause number CR2016-471. Pursuant to the habitual offender provision, the court sentenced appellant to fifty-five years in prison for each of the six offenses and ordered the sentences to run concurrently with each other and with appellant's federal prison sentence. *See id.* § 12.42(d).

## DISCUSSION

In a single point of error in appeal number 03-18-00667-CR and his first point of error in appeal number 03-18-00773-CR, appellant argues that his convictions in both cases must be reversed because the State's failure to comply with the trial time limit of the Interstate Agreement on Detainers Act (IADA) required dismissal of the indictments. In his second point of error in appeal number 03-18-00773-CR, appellant contends that his convictions in cause number CR2016-471 must be reversed because the trial court lacked jurisdiction over these offenses under the IADA. Finally, in his third and fourth points of error in appeal number 03-18-00773-CR, appellant asserts that the evidence was insufficient to support the trial court's deadly weapon findings as to the drug-possession offenses in cause number CR2016-471.

### Interstate Agreement on Detainers Act

The IADA is a congressionally sanctioned compact between participating states that enables a party state to obtain custody of an out-of-state prisoner for prosecution and imposes duties to ensure a prisoner's quick return to the sending state.[5] *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017); *State v. Williams*, 938 S.W.2d 456, 460 (Tex.

---

[5] "State" as used in the IADA includes the United States federal government. *See* Tex. Code Crim. Proc. art. 51.14, art. II(a); 18 U.S.C. App. 2, § 2 (enacting IADA).

8

Crim. App. 1997). Texas is a party to the IADA and has codified the IADA's provisions in article 51.14 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 51.14; *Hopper*, 520 S.W.3d at 924; *State v. Votta*, 299 S.W.3d 130, 134–35 (Tex. Crim. App. 2009). Pursuant to the IADA, "[i]f a defendant is serving a term of imprisonment in another state and the State of Texas files a detainer in that other state, both the State of Texas and the defendant have a right to demand the transfer of the defendant to Texas for a final disposition of the pending Texas charge." *Hopper*, 520 S.W.3d at 924–25; *see* Tex. Code Crim. Proc. art. 51.14, arts. III(a), IV(a).

Article III of the IADA provides the procedure by which a prisoner in one state *against whom a detainer has been lodged* by another state can demand a speedy disposition of the charges giving rise to the detainer. *See* Tex. Code Crim. Proc. art. 51.14, art. III; *United States v. Mauro*, 436 U.S. 340, 351 (1978). If the defendant initiates a demand under the IADA and complies with all the requirements of article 51.14, the State of Texas must bring the defendant to trial within 180 days after the prosecuting officer and the appropriate court receive the defendant's demand, provided that for good cause the trial court may grant any reasonable or necessary continuance. Tex. Code Crim. Proc. art. 51.14, art. III(a); *see Votta*, 299 S.W.3d at 135.

Article IV of the Act provides the procedure by which a prosecutor in one state *who has lodged a detainer against a prisoner in another state* can secure the prisoner's presence for disposition of the outstanding charge. *See* Tex. Code Crim. Proc. art. 51.14, art. IV(a); *Mauro*, 436 U.S. at 351. If the State of Texas initiates a demand under the IADA, the State of Texas must bring the defendant to trial within 120 days of his arrival in Texas, provided that for good cause the trial court may grant any reasonable or necessary continuance. Tex. Code Crim. Proc. art. 51.14, art. IV(c).

The penalty for failing to meet the deadlines of the IADA is severe. If a case is not brought to trial within the applicable Article III or Article IV time period, the court where the indictment is pending "shall enter an order dismissing the same with prejudice." *Id.* art. 51.14, arts. III(d), IV(e); *see Williams*, 938 S.W.2d at 459 (stating that IADA "requires a dismissal of the prosecution from the docket, with prejudice, if the Act's time limits are not met").

### *Trial Time Limit*

In his sole point of error in appeal number 03-18-00667-CR and his first point of error in appeal number 03-18-00773-CR, appellant claims that his convictions should be reversed because his indictments were subject to dismissal under Article IV since the State failed to bring him to trial within 120 days of his arrival in Comal County.

As an initial matter, we observe that in their appellate briefing, both parties refer to the 120-day time limit of Article IV. But at a hearing in the trial court on a motion to withdraw filed by appellant's retained counsel, the State and the trial judge indicated that the applicable time limit for having the trial was 180 days because appellant had initiated the request for disposition under the IADA. However, we need not resolve this conflict to determine which time period is at issue because we conclude that appellant has failed to demonstrate that the IADA was triggered and applied to his cases.

The provisions of the IADA apply only when a "detainer" has first been "lodged against the prisoner" with the custodial jurisdiction. *See* Tex. Code Crim. Proc. art. 51.14, arts. III(a) (providing that prisoner may request disposition of "untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner"), IV(a) (providing that prosecutor "shall be entitled to have a prisoner against whom he has lodged a

10

detainer . . . made available . . . upon presentation of a written request for temporary custody"); *see also Corral v. State*, No. 08-06-00270-CR, 2010 WL 1230555, at \*4–5 (Tex. App.—El Paso Mar. 31, 2010, no pet.) (mem. op., not designated for publication) (observing that provisions of IADA require that detainer be lodged against defendant). Whether it is a member state attempting to obtain an incarcerated prisoner from another member state or a prisoner demanding speedy disposition of charges pending in another member state, "the provisions of the Agreement are triggered *only* when a 'detainer' is filed with the custodial (sending) state by another state (receiving) having untried charges pending against the prisoner[.]" *Mauro*, 436 U.S. at 343 (emphasis added); *accord Johnson v. State*, 900 S.W.2d 475, 479 (Tex. App.—Beaumont 1995), *aff'd as reformed*, 930 S.W.2d 589 (Tex. Crim. App. 1996); *see Lasker v. State*, 577 S.W.3d 583, 589 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) ("Under the IADA, the prosecuting authority seeking to try an individual who is incarcerated in another state's institution must file a detainer with the institution in the state where the individual is being held."); *State v. Miles*, 101 S.W.3d 180, 183 (Tex. App.—Dallas 2003, no pet.) (concluding that provisions of article III of IADA "apply only when a 'detainer' has first been 'lodged against the prisoner' with the custodial jurisdiction").

The term "detainer" is not defined within the IADA. However, both the United States Supreme Court and the Texas Court of Criminal Appeals have described a "detainer" as "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking that the prisoner be held for the agency, or that the agency be advised when the prisoner's release is imminent." *Fex v. Michigan*, 507 U.S. 43, 44 (1993); *see Votta*, 299 S.W.3d at 135, n.5 (defining detainer by quoting definition in *Fex*); *see also Alabama v. Bozeman*, 533 U.S. 146, 147 (2001) (observing that IADA "creates uniform procedures for lodging and executing a

11

detainer, *i.e.,* a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime"). Nothing in the record before us establishes that the State of Texas or Comal County lodged a detainer against appellant for the offenses charged in either cause number CR2016-123 or cause number CR2016-471.

In his briefing, appellant refers to "Interstate Detainer Act paperwork" in the record of cause number CR2016-123, asserting that such paperwork "establish[ed] that IAD was invoked by the State pursuant to Article IV of the IAD." However, the documents referenced by appellant appear to be the State's written request for temporary custody and acceptance of temporary custody. While it is true that these documents purport to seek and accept temporary custody of appellant pursuant to the IADA, they do not demonstrate that a detainer was filed against appellant.[6] It is the lodging of a detainer, not a request for custody that triggers the IADA. *See Mauro*, 436 U.S. at 343–44 ("[T]he provisions of the Agreement are triggered *only* when a "detainer" is filed . . . ; to obtain temporary custody, the receiving State must *also* file an appropriate 'request' with the sending State." (emphases added)).

The other document referenced by appellant is a magistrate's warning form in the record of CR2016-123, which reflects that appellant was arrested for, and admonished concerning, several charges: "FTA – Possess w/Int to Del CS PG 1 >+ 4 g < 200 g ct I"; "FTA – Tamper Fabricating Phys Evid w/Intent to Impair ct II"; "VPTA – POM < 2 oz"; and "VPTA – PAM < 2 oz." This document suggests that, in connection with the drug-possession charge and

---

[6] Further, we note that one document reflects that the State sought temporary custody pursuant to Article IV of the IADA, but the other document reflects that the State accepted temporary custody pursuant to Article III of the IADA in response to a letter from the warden offering temporary custody.

12

the tampering charge in CR2016-123, appellant was taken into custody pursuant to outstanding arrest warrants for failure to appear.[7]  An arrest warrant is not a detainer.  *Compare* Tex. Code Crim. Proc. art. 15.01 ("A 'warrant of arrest' is a written order from a magistrate, directed to a peace officer or some other person specially named, commanding him to take the body of the person accused of an offense, to be dealt with according to law."), *with Mauro*, 436 U.S. at 359 (describing detainer as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction"); *see United States v. Bottoms*, 755 F.2d 1349, 1350 (9th Cir. 1985) (concluding that statutory language of IADA did not apply to appellant who was being detained by virtue of arrest warrant); *In re Ryan*, 10-04-00128-CR, 2004 WL 2365239, at *10 (Tex. App.—Waco Oct. 20, 2004, orig. proceeding) (per curiam) (Gray, C.J., dissenting) ("A detainer based on a warrant, however, does not fall within the IADA."); *see also Carchman v. Nash*, 473 U.S. 716, 725 (1985) (concluding that detainer based on probation-violation charge, "which does not accuse an individual with having committed a criminal offense in the sense of initiating a prosecution," is not governed by IADA).

The record before us contains scarce, incomplete, and conflicting information about how appellant came to be in custody in the Comal County Jail and who may have initiated the transfer of appellant for his appearance before the trial court on the charges in the instant cases.  At the hearing on retained counsel's motion to withdraw, the prosecutor commented that "[appellant] is a federal prisoner.  We just got him."  Appellant's retained counsel remarked that "[w]e have been trying to do this since April" and expressed that he did not know whether

---

[7]  This suggestion is supported by a bailiff's certification in the record in CR2016-123 that reflects appellant's failure to appear for a setting in the 207th Judicial District Court in that case.

13

appellant had filed a request under the IADA and was "not aware of it."  Later in the hearing, the prosecutor indicated—and appellant seemed to implicitly confirm—that appellant made a request for disposition under the IADA.  However, although one document in the record suggests that appellant might have made such a request (the form accepting temporary custody purportedly pursuant to Article III of the IADA), no documents in the record demonstrate appellant's compliance with the procedural requirements of Article III of the IADA.  *See Office v. State*, 563 S.W.3d 457, 462 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (stating that prisoner making request under IADA "bears the burden of demonstrating compliance with article III"); *Villegas v. State*, No. 03-05-00665-CR, 2007 WL 486612, at *3 (Tex. App.—Austin Feb. 13, 2007, pet. ref'd) (mem. op., not designated for publication) ("The inmate bears the burden of demonstrating strict compliance with the procedural requirements of article III."); *see also Johnson v. Stagner*, 781 F.2d 758, 761 (9th Cir. 1986) (observing that "'formal requirements must be met before the timely trial provisions of the IAD come into play'" (quoting *Tinghitella v. California*, 718 F.2d 308, 312 (9th Cir. 1983))).  Further, on appeal, appellant asserts that the State initiated custody under Article IV of the IADA, and one document in the record suggests that the State might have done so (the written request for temporary custody purportedly pursuant to Article IV of the IADA).

However, despite the implication that the IADA might have been involved in occasioning appellant's custody in Comal County, nothing in the record demonstrates that the IADA was in fact triggered in these cases.  In their briefs, both parties assert, apparently assuming from the conflicting documents referencing the IADA in the record of CR2016-123, that a detainer was lodged against appellant for those offenses.  However, nothing in the record demonstrates that a formal detainer preceded the State's written request for temporary custody

(purportedly pursuant to Article IV of the IADA) or the State's written acceptance of temporary custody (purportedly pursuant to Article III of the IADA). *See Amador v. State*, 221 S.W.3d 666, 675 (Tex. Crim. App. 2007) (observing that "reviewing courts cannot 'assume' or speculate about the contents of exhibits or other materials that are not contained in the appellate record"); *Green v. State*, 912 S.W.2d 189, 192 (Tex. Crim. App. 1995) ("This Court does not decide cases based on speculation about matters not shown in the record."); *see also Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) ("An appellate court may not consider factual assertions that are outside the record."); *Hailey v. State*, 413 S.W.3d 457, 491 (Tex. App.—Fort Worth 2012, pet. ref'd) ("Mere assertions in a brief not supported by the record will not be considered on appeal.").

Our law "imposes . . . [a] burden on the appealing party to make a record demonstrating that error occurred in the trial court." *Davis v. State*, 345 S.W.3d 71, 77 (Tex. Crim. App. 2011); *see London v. State*, 490 S.W.3d 503, 508 (Tex. Crim. App. 2016) (observing that "the appealing party carries the burden to ensure that the record on appeal is sufficient to resolve the issues presented"); *Rivera v. State*, 581 S.W.2d 161, 163 (Tex. Crim. App. 1979) ("The burden to present a sufficient record is on the appealing party."). Appellant, as the appealing party, has an obligation to present a record in this Court that demonstrates that he is entitled to relief under the IADA. This means that, before appellant can claim a violation of the provisions of the IADA or seek relief under its provisions, as he attempts to do in these appeals, he must demonstrate the statute's applicability to his cases. He failed to do so. The record before this Court is insufficient to establish that the provisions of the IADA were triggered because the record does not demonstrate that the State of Texas (or Comal County) lodged a detainer against appellant for any of the charges to which he pled guilty and for which he was

convicted—a necessary requirement to activate the IADA. The Court of Criminal Appeals has explained that it has "consistently held" that it is the appealing party—here, appellant—who must bear the consequences of a deficiency in the record. *See Davis*, 345 S.W.3d at 78; *see, e.g.*, *id.* ("In the IADA context, this means [appellant] must present a record adequate to *show* that the State did not satisfy its trial-level burden to present good cause for the continuance, and that the trial court therefore abused its discretion to grant it.").

Because the record here does not show that any detainer for the charges in these cases was lodged against appellant when he was in federal custody, appellant failed to demonstrate that the provisions of the IADA applied to these cases. Thus, appellant cannot avail himself of the provisions contained in article 51.14—including the 180-day trial time limit of Article III or the 120-day trial time limit of Article IV and the related dismissal provisions. *See e.g.*, *Mauro*, 436 U.S. at 361 (concluding that because "the Government never filed a detainer against [the defendants], the Agreement never became applicable and the United States was never bound by its provisions"); *United States v. Ray*, 899 F.3d 852, 859–60 (10th Cir. 2018), *cert. denied*, — U.S. —, 139 S.Ct. 1206 (2019) (concluding that because federal government never lodged detainer with Colorado, IADA did not apply; because IADA did not apply, government could not have violated it); *United States v. Jones*, 938 F.2d 447, 449 (3d Cir. 1991) ("Because there was no detainer, the IAD was not triggered and could not have been violated."); *Votta*, 299 S.W.3d at 138 (concluding that court of appeals erred in affirming trial court's dismissal of charges under IADA because detainers were not filed against defendant for those charges); *Johnson*, 900 S.W.2d at 479 ("Since no detainer was ever filed by Liberty County authorities with regard to the Delivery of Cocaine case, the provisions of article 51.14 were

16

never triggered."). Accordingly, we overrule appellant's sole point of error in appeal number 03-18-00667-CR and his first point of error in appeal number 03-18-00773-CR.

### Trial-Court Jurisdiction

In his second point of error in appeal number 03-18-00773-CR, appellant contends that his convictions in cause number CR2016-471 must be reversed because the trial court lacked jurisdiction over these offenses under the IADA.

Appellant's contention is premised on Article V(d) of the IADA, which limits a receiving state's authority to prosecute prisoners in temporary custody pursuant to the IADA to only those charges that are contained in the detainer that formed the basis for the inmate's temporary custody in the receiving state unless the non-detainer charge arises out of the same transaction as the pending charges that form the basis of the detainer. *See* Tex. Code Crim. Proc. art. 51.14, art. V(d). Appellant argues that the trial court lacked jurisdiction over the charges in CR2016-471 because they did not form the basis of the detainer, nor arise from the same transaction as those forming the basis of the detainer, in CR2016-123.

However, as we just explained, the record does not demonstrate that any detainers were lodged against appellant such that that the provisions of the IADA were triggered in these cases. Because no detainers were lodged against appellant, the provisions of the IADA—including the limiting provision of Article V(d)—did not apply. Accordingly, we overrule appellant's second point of error.[8]

---

[8] Given our conclusion that appellant failed to demonstrate that the IADA applied to his cases, we do not address the State's contentions that appellant waived his IADA complaints.

17

## Deadly Weapon Findings

In his third and fourth points of error in appeal number 03-18-00733-CR, appellant argues that the evidence was insufficient to support the trial court's findings that he used or exhibited a deadly weapon during the commission of the offenses of possession of a controlled substance in cause number CR2016-741. Specifically, he claims that the evidence was insufficient to prove that the .357 handgun recovered from his car facilitated his possession of the heroin that he tossed from his car or the methamphetamine recovered later from his girlfriend's residence where he was staying.

A deadly weapon finding is proper if the defendant used or exhibited a deadly weapon during the commission of a felony offense or during immediate flight therefrom. *See* Tex. Code Crim. Proc. art. 42A.054(b). The term "use," in the context of a deadly weapon finding, means "'any employment of a deadly weapon, even simple possession, if such possession facilitates the associated felony.'" *Coleman v. State*, 145 S.W.3d 649, 652 (Tex. Crim. App. 2004) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)). The term "exhibit" requires a weapon to be "consciously shown, displayed, or presented to be viewed." *Id.* (quoting *Patterson*, 769 S.W.2d at 941).

In determining whether a weapon was used as a deadly weapon in furtherance of possessing a controlled substance, reviewing courts consider the cumulative effect of several factors, including: (1) the type of gun involved; (2) whether the gun was loaded; (3) whether the gun was stolen; (4) the proximity of the gun to the drugs, drug paraphernalia, or drug manufacturing materials; (5) the accessibility of the gun to whomever controlled the premises; (6) the quantity of drugs involved; and (7) any evidence that might demonstrate an alternative purpose for the presence of the gun. *Coleman*, 145 S.W.3d at 658–60 (Cochran, J., concurring);

18

*see Hall v. State*, No. 05-18-00755-CR, 2019 WL 3773852, at \*5–6 (Tex. App.—Dallas Aug. 12, 2019, no pet.) (mem. op., not designated for publication) (reciting *Coleman* factors); *Johnson v. State*, No. 06-13-00227-CR, 2014 WL 4695063, at \*13–14 (Tex. App.—Texarkana Sept. 22, 2014, pet. ref'd) (mem. op., not designated for publication) (same); *Castillo v. State*, 426 S.W.3d 135, 138 n.2 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (same); *Bahr v. State*, 295 S.W.3d 701, 709 (Tex. App.—Amarillo 2009, pet. ref'd) (same). The focus is on the proximity of the gun to the drugs, not the proximity of the gun to the defendant. *Coleman*, 145 S.W.3d at 654–55.

It is undisputed that a firearm, a deadly weapon per se, *see* Tex. Penal Code § 1.07(a)(17)(A), was discovered in appellant's car during the January 6th stop. The question is whether a rational trier of fact could have found beyond a reasonable doubt that appellant used the firearm to facilitate his possession and intended distribution of the narcotics seized that day. *See Coleman*, 145 S.W.3d at 655.

In this case, the evidence established that the Smith & Wesson .357 handgun, which was loaded, was discovered in between appellant's seat and the console. Although the firearm was wrapped in a paper towel, testimony showed that the task-force detective observed appellant engage in "furtive movements" toward the inside of the car while sitting in the driver's seat before he complied with directions to get out of the car. The firearm was in close proximity to narcotics—the heroin in appellant's hand before he threw it out of the car and marijuana found on the floorboard by the driver's seat—as well as drug paraphernalia and drug-distribution materials discovered in the car. The gun was readily accessible to appellant (within his immediate reach), and evidence showed that it belonged to him; he had the firearm for two years

19

but did not know if it was stolen, having traded it for methamphetamine. There was no evidence that might show an alternative purpose for the weapon's presence.

Moreover, the undisputed evidence established that appellant was actively involved in illegal narcotics trafficking. The task-force detective testified that it is common for individuals to use firearms in the narcotics-distribution business. In fact, evidence before the court demonstrated that, after the laundromat incident when appellant tossed a different handgun out of his car, appellant admitted to the task-force detective that he carried the weapon because of his gang affiliation and his drug-distribution business.[9] Indeed, it is commonly recognized that narcotics dealers often possess firearms for the purpose of protecting themselves, their drugs, and their money. *See Plummer v. State*, 410 S.W.3d 855, 859 (Tex. Crim. App. 2013) ("The nature of the illegal drug trade invites the possibility of violence and encourages drug dealers to carry deadly weapons to protect themselves and their inventory."); *Wilson v. State*, 132 S.W.3d 695, 698 (Tex. App.—Amarillo 2004, pet. ref'd) (recognizing that association between weapons and drug trade "is rather settled").

While it is true that the heroin was found outside of appellant's car when the firearm was inside it, the evidence showed that appellant possessed the heroin inside the car in close proximity to the firearm when he held the narcotics in his hand before he threw the heroin out of his car. Furthermore, although appellant was not present at his girlfriend's residence when the methamphetamine was found, the evidence showed that he was staying there, that he admitted the methamphetamine found in the residence belonged to him, that the bundles of money found in the master bedroom were found with his mail, and that various items connected

---

[9] Furthermore, the evidence demonstrated that, in federal court, appellant pled guilty to possession of a firearm "in furtherance of drug trafficking crimes" based on his possession of the Taurus handgun and methamphetamine on April 28, 2013.

20

to his drug-dealing business were also found in the residence. The cumulative evidence showed that—on multiple occasions—appellant, who admitted that he was actively engaged in narcotics distribution, was found in possession of large amounts of narcotics, large amounts of cash, drug-distribution materials, and various firearms. Appellant's own admissions demonstrated that he used firearms in connection with his narcotics-distribution business.

Viewing the evidence in the light most favorable to the trial court's findings and considering all the relevant factors, we conclude that the trial court could rationally determine that appellant used his firearm to facilitate his possession and intended distribution of the narcotics seized that day. *See Coleman*, 145 S.W.3d at 655; *see, e.g.*, *id.* at 654–55 (holding evidence sufficient to support deadly weapon finding, despite fact that defendant was handcuffed outside house, where drugs were found throughout house, and two guns were found inside room with safe containing two large bottles of PCP and large amount of cash); *Gale v. State*, 998 S.W.2d 221, 222–23 (Tex. Crim. App. 1999) (upholding deadly weapon finding where officers found guns, which were unloaded but could have been loaded within seconds, along with marijuana packaged for sale and cash in small closet because rational factfinder could conclude that guns facilitated appellant's possession of marijuana, despite presence of appellant's wife); *Castillo*, 426 S.W.3d at 138–139 (concluding that evidence was sufficient to support deadly weapon finding where semi-automatic rifle and shotgun, which were both loaded, were found in immediate proximity to drugs and drug paraphernalia in plain view in room where defendant was sleeping); *Smith v. State*, 176 S.W.3d 907, 920 (Tex. App.—Dallas 2005, pet. ref'd) (concluding that unloaded firearms stored close to marijuana facilitated appellant's possession of marijuana). We therefore hold that the evidence was sufficient to support the trial court's affirmative deadly

weapon findings that appellant used a deadly weapon while committing the offenses of possession of a controlled substance. We overrule appellant's third and fourth points of error.

## CONCLUSION

Having concluded that appellant failed to demonstrate that he was entitled to relief under the IADA because he failed to establish that the IADA was triggered and applied to his cases and having further concluded that the evidence was sufficient to support the trial court's deadly weapon findings relating to the drug-possession offenses in CR201-741, we affirm the trial court's judgments of conviction.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   August 31, 2020

Publish